J-S02029-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER GOODWIN | : | |
| | : | |
| Appellant | : | No. 3609 EDA 2016 |

Appeal from the PCRA Order October 24, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0012214-2011

BEFORE:  BOWES, J., NICHOLS, J., and RANSOM, J.[*]

MEMORANDUM BY NICHOLS, J.:                          **FILED JUNE 28, 2018**

Appellant Christopher Goodwin appeals *pro se* from the order denying his timely first Post Conviction Relief Act[1] (PCRA) petition without a hearing. Appellant raises a multitude of ineffective assistance of counsel claims[2] in connection with his conviction for first-degree murder[3] and related offenses.[4] Appellant also asserts that the PCRA court erred by failing to hold an evidentiary hearing, refusing to allow him to amend his PCRA petition, and

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] We have reordered Appellant's claims and arguments for the purpose of review.

[3] 18 Pa.C.S. § 2502(a).

[4] 18 Pa.C.S. §§ 6106, 6108.

accepting PCRA counsel's petition to withdraw as counsel pursuant to **Turner**/**Finley**.[5]  We affirm.

A review of the record reveals the following facts and procedural history relevant to this appeal.  Shortly after midnight on June 25, 2011, Dwayne Isaacs (Decedent) was shot and killed in the Wilson Park project in Philadelphia (Wilson Park).  The shooting occurred in a small circular park near 27th and Jackson Streets.  Investigators obtained information that three individuals, Andre Cunningham, Aaron Respes, and Raheem Zachary, witnessed the shooting.

Philadelphia Police Detective John Verrecchio was assigned the case, and Detective Thomas Gaul assisted Detective Verrecchio.  Police also received anonymous tips regarding the incident, but those tips were not documented in writing.

On July 21, 2011, Cunningham gave a written statement to Detectives Verrecchio and Gaul.[6]  According to Cunningham's statement, he was in the park, and Aaron Respes and Raheem Zachary were sitting on a bench inside the park.  Appellant climbed over a fence to enter the park, went to Respes

---

[5] **See Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[6]Cunningham was brought to the police station approximately eighteen hours before giving his written statement to Detectives Verrecchio and Gaul.

and Zachary, and asked them if they had any "Xannies."[7] Decedent walked down the pathway of the park. Appellant approached Decedent and shot Decedent in the head. After Decedent fell to the ground, Appellant continued shooting as he walked away from Decedent.

Cunningham identified Appellant as the shooter by Appellant's nickname, "Gunna," by his first name, "Chris," and by his photograph. Cunningham signed his written statement to the police and Appellant's photograph.

The following day, July 22, 2011, Respes gave a written statement to Detectives Verrecchio and Gaul.[8] According to Respes, he was walking past the park and saw Appellant shoot Decedent. Respes identified Appellant by his nickname, and by a photograph. Respes signed his statement and Appellant's photograph. Respes did not indicate that there were other people in the area or that Appellant asked for "Xannies."

Zachary was also interviewed by police. However, Zachary refused to give a written statement.[9]

---

[7] No evidence was introduced to establish that the term "Xannies" referred to a narcotic. However, "Xannies" apparently referred to Xanax. *See* N.T., 5/22/14, at 219.

[8] Respes was brought to the police station approximate twelve hours before giving his written statement to Detectives Verrecchio and Gaul.

[9] A police activity log associated with Zachary's oral statement indicated, in part, that Zachary told detective that he was in the park at the time of the shooting but did not see the shooter.

Investigators also received information that Decedent was involved in a confrontation with Leroy Brown (Kamac)[10] shortly before the shooting. The information suggested that the confrontation involved a prior home invasion during which Rahsul Issacs, Decedent's nephew, shot Lekkir Brown, Kamac's son.

On August 2, 2011, Appellant was charged with the murder of Decedent and was taken into custody that same day. The trial court initially scheduled a preliminary hearing for August 24, 2011, but continued the hearing when Cunningham and Respes failed to appear.

On October 25, 2011, Detectives Verrecchio and Gaul brought Respes to court for the preliminary hearing. At the hearing, Respes testified that Appellant shot Decedent.[11]

Immediately after the preliminary hearing, Respes met with Tobi Downing, a relocation coordinator in the District Attorney's Office. Respes signed a form declining relocation assistance.

Two days after his first meeting with Tobi Downing, Aaron Respes called the relocation office. The next day, on October 28, 2011, Respes again met with Downing, this time with his mother. At some point after that meeting, Respes and his mother moved out of Wilson Park.

_____

[10] Appellant uses the spelling "Camac" throughout his brief. We use the spelling "Kamac" based on the spelling used in the trial transcript.

[11] Cunningham did not appear at the October 25, 2011 preliminary hearing.

On June 3, 2012, Cunningham contacted a defense investigator and recanted his statement to the police. Cunningham informed the defense investigator that a detective, allegedly Detective John Pitts, choked him before he gave his statement to Detectives Verrecchio and Gaul.

In May 2013, immediately before trial, Cunningham met the assigned prosecutor at her office. Detective Verrecchio was also present during portions of the meeting. At some point during this meeting, the Commonwealth printed photographs from Facebook purporting to show Appellant and Lekkir Brown together, as well as Respes.

Appellant proceeded to a jury trial, and the Commonwealth began its case on May 20, 2013. The Commonwealth asserted that Appellant shot and killed Decedent in retaliation for the shooting of Kamac's son by Decedent's nephew during a home invasion. In support, the Commonwealth called Decedent's sister, Lisa Hall, who testified that Decedent told her about a confrontation with Kamac. According to Hall, Decedent told her that he was worried about going out in the neighborhood because of his confrontation with Kamac.

During the Commonwealth's direct examination of Cunningham, Cunningham recanted his statement to police and testified that he did not see the shooting. According to Cunningham, he was intoxicated at the time of the interview. The prosecutor also questioned Cunningham about their meeting shortly before trial and the process by which the prosecutor obtained photographs from Facebook. The prosecutor also questioned Cunningham

about statements he purportedly made during that meeting, including statements involving threats against Respes. The Commonwealth admitted the Facebook photographs of Appellant and Lekkir Brown and of Respes into evidence.

On cross-examination, trial counsel elicited Cunningham's testimony that he was on Taney Terrace where he saw Appellant with two females. Cunningham also testified that a black detective with a lump on his neck choked and threatened him before he gave his statement to Detectives Verrecchio and Gaul. Cunningham did not know the name of the detective who threatened him.

During the Commonwealth's direct examination of Respes, Respes also recanted his statement to the police.[12] The Commonwealth admitted Cunningham's and Respes' prior written and signed statements to police as substantive evidence. Respes denied receiving any threats or seeking relocation for himself. Respes explained that he agreed to relocation to assist his mother.

The defense, in turn, emphasized that Cunningham's and Respes' statements to police should not be credited. The defense challenged the adequacy of the investigation into Decedent's murder and asserted that there

_____

[12] Cunningham completely recanted his statement to police and testified that he did not see the shooting. Respes also denied identifying Appellant during his statement to the police. Respes testified at trial that he was at the scene of the shooting, heard a gunshot, and saw Decedent and "someone who looked like [Appellant]" holding a gun. N.T., 5/21/13, at 86-91.

was a rush to judgment to implicate Appellant. The defense emphasized that there were more likely suspects in the shooting, including Kamac, with whom Decedent was in a confrontation over the prior home invasion. Additionally, Anara Brown—Kamac's niece and the cousin of Lekkir Brown, who was shot in the home invasion—testified for the defense. Anara Brown stated she was with Appellant on the 2600 block of Jackson Street at the time of the shooting. Appellant elected not to testify at trial.

On May 28, 2013, the jury found Appellant guilty of first-degree murder and related offenses. That same day, the trial court sentenced Appellant to life imprisonment.

This Court affirmed his judgment of sentence on July 14, 2014.[13] **Commonwealth v. Goodwin**, 2009 EDA 2013 (Pa. Super. July 14, 2014) (unpublished memorandum). On January 21, 2015, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. **Commonwealth v. Goodwin**, 108 A.3d 34 (Pa. 2015).

On June 15, 2015, Appellant filed the timely *pro se* PCRA petition that gives rise to this appeal. The PCRA court appointed counsel to represent Appellant, and PCRA counsel entered his appearance on April 11, 2016. On July 8, 2016, Appellant filed a *pro se* motion for appointment of new PCRA counsel. On August 10, 2016, PCRA counsel filed a **Turner/Finley** "no-merit"

---

[13] In his direct appeal, Appellant challenged the sufficiency and weight of the evidence. **See Goodwin**, 2009 EDA 2013, at *2.

letter. On September 6, 2016, Appellant filed a *pro se* "Response and Objection to Counsel's '*Finley* No-Merit Letter.'" On September 22, 2016, the PCRA court issued a notice of intent to dismiss pursuant to Pa.R.Crim.P. 907. That same day, the court denied Appellant's July 8, 2016 request for new counsel.

Appellant filed a *pro se* response to the PCRA court's Rule 907 notice. On October 24, 2016, the PCRA court denied Appellant PCRA relief and granted PCRA counsel's motion to withdraw.

Appellant filed a timely notice of appeal *pro se*. The PCRA court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant, in his *pro se* brief, sets forth thirteen issues with related arguments. For the purposes of this appeal, we reproduce the headings of Appellant's arguments in the following order:[14]

    1.   Was trial counsel ineffective for failing to adequately prepare a pretrial investigation[?]

    2.   Was trial counsel ineffective for failing to object to the prosecutor eliciting hearsay evidence of [Decedent's] then existing state of mind[?]

    3.   Was trial counsel ineffective for failing to object to the prosecutor eliciting hearsay evidence of threats, arguing with

---

[14] Appellant presents fifteen questions involved in this appeal, but combines several questions in the headings in his brief. Appellant's Brief at 7-8. We elect to address Appellant's issues as stated in the headings for each issue in his brief, but have reordered the issues.

[a] witness, improper bolstering, the trial court giving a faulty instruction and allowing threat evidence[?]

4. Was trial counsel ineffective for opening the door to numerous [instances of] prejudicial testimony[?]

5. Was direct appeal counsel ineffective for failing to challenge hearsay evidence[?[15]].

6. Was trial counsel ineffective for failing to object and request a mistrial due to [a] pretrial discovery violation[?]

7. Was trial counsel ineffective for failing to elicit testimony that [K]amac was a possible shooter, by impeaching the witness with exculpatory evidence within his possession[?]

8. Was trial counsel ineffective for failing to object to the prosecutor's numerous fraud[s] upon the court[?]

9. Was trial counsel ineffective for failing to object to the numerous [instances of] prosecutorial misconduct in closing argument[?]

10. Was trial counsel ineffective for failing to object to the prosecutor improperly focusing the jury['s] attention on the element of fear in order to inflame the passions of the jury[?]

11. W[ere] Appellant's due process rights violated due to the cumulative effect of the errors complained of herein[?]

12. Did the PCRA court err[] by denying Appellant's PCRA petition without a[n] evidentiary hearing, failing to grant leave to amend, and accepting PCRA counsel *Finley* letter[?]

13. Was PCRA counsel ineffective due to the following performance summarized below[?]

---

[15] The heading in page 27 of Appellant's brief stated: "Was trial counsel ineffective for opening the door to numerous prejudicial testimony and was direct appeal counsel ineffective for failing to challenge hearsay evidence." Appellant's Brief at 27 (some capitalization omitted). We have separated these two arguments for the purposes of this disposition.

*See* Appellant's Brief at 11-12, 19, 21, 27, 31, 35, 38, 40, 44, 48, 51, 52 (some capitalization omitted).

Appellant, in his first ten issues, contends that the PCRA court erred in dismissing his ineffective assistance of counsel claims. Our review is governed by the following principles:

> We must examine whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.
>
> * * *
>
> It is well-established that counsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error.

*Commonwealth v. Franklin*, 990 A.2d 795, 797 (Pa. Super. 2010) (citations omitted). We may affirm the PCRA court's ruling on any basis apparent in the record. *Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009).

**1. Trial counsel's failure to prepare a pretrial investigation**

In his first issue, Appellant asserts that the PCRA court erred in dismissing his claims that trial counsel failed to prepare for trial. In support, he argues that trial counsel failed to investigate or call two witness—Tiara Young and Raheem Zachary. Appellant's Brief at 13-15. Appellant also suggests that trial counsel appeared to be unaware of information in the anonymous tips given to police and Respes' relocation paperwork. Further,

- 10 -

Appellant argues that trial counsel should have discovered and presented evidence that Detective Pitts had a history of threatening and assaulting suspects. *Id.* at 15-17. We address these arguments separately.

### (A)   Tiara Young

The background to Appellant's claim that trial counsel should have investigated Tiara Young is as follows. Yvette Morris gave a statement to police that Young called her after the shooting and said that there was a rumor that Kamac shot the victim. Appellant's Brief at 13. From this, Appellant suggests that a proper investigation of Young would have revealed the identity of the individual who stated that Kamac was the actual shooter.

When raising a claim of ineffectiveness for failure to call a potential witness, a petitioner must establish that

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Matias*, 63 A.3d 807, 810-11 (Pa. Super. 2013) (*en banc*) (citation omitted).

Instantly, Appellant failed to establish that either Tiara Young or the individual who allegedly told Young about the crime existed or were available and willing to testify for the defense. Thus, Appellant's claim that trial counsel was ineffective for failing to investigate or call Young fails. *See Matias*, 63 A.3d at 810-11.

(B)   Raheem Zachary

As to Zachary, Appellant asserts Zachary would have testified that he saw the shooter, who did not match Appellant's description, and could have provided further testimony to support Appellant's alibi defense by testifying that he saw Appellant with two females on the 2600 block of Jackson Street.[16] Appellant specifically argues the PCRA court erred in concluding that Appellant failed to establish prejudice.  Appellant's Brief at 14-15.

Our review reveals that Zachary's proposed testimony that he saw an individual running from the scene is too speculative to warrant relief, as Zachary testified he was one block away from the shooting and did not see the shooting.  Thus, Zachary's mere assertion that the individual he saw was the shooter, does not establish merit or prejudice based on trial counsel's alleged failure to discover this information.  ***See Matias***, 63 A.3d at 810-11.

Moreover, Zachary's proposed testimony that he saw Appellant with two women on the 2600 block of Jackson Street was cumulative of testimony already presented at trial.  Anara Brown testified at trial that she was with

_____

[16] We note that Appellant, in his response to the PCRA court's Rule 907 notice provided a certification that Raheem Zachary would testify that he had a clear view of the shooter and that Appellant was not the shooter.  Appellant's certification also indicated that Zachary refused to sign a statement the detective's prepared implicating Appellant during the investigation.  Appellant has also attached to his brief an affidavit in which Zachary states he saw Appellant and two females outside 2620 Jackson Street, and then heard shots. Zachary saw a person fleeing the scene of the shooting who did not match Appellant's description.  We will consider Zachary's affidavit for the purpose of this appeal.

Appellant in front of 2620 Jackson Street at the time of the shooting and that Appellant did not shoot Decedent.[17]   N.T., 5/22/13, at 248-49, 252-53. Accordingly, we agree with the PCRA court that Appellant did not establish prejudice from trial counsel's alleged failure to interview or call Zachary. **See id.**

(C)     Anonymous tips and Aaron Respes' relocation paperwork

Appellant also argues the PCRA court improperly rejected his claim that trial counsel's failed to investigate the anonymous tips received by police and Respes' relocation paperwork.  In sum, Appellant claims that if trial counsel had been prepared, counsel could have utilized information to better effect or refrained from referring to other information.  These arguments, however, are duplicative of more specific claims discussed below.  At this juncture, we note that the record belies Appellant's arguments that trial counsel failed to discover the information that (1) the anonymous tips received by the police implicated Appellant, as well as other individuals, in the shooting, and (2) Respes declined relocation services.

(D)     Evidence regarding Detective Pitts

Appellant further argues the PCRA court should have granted relief on his claim that trial counsel was ineffective for failing to investigate the detective who allegedly brutalized Cunningham before Cunningham gave his

---

[17] Additionally, after recanting his statement to police, Cunningham testified that he observed Appellant with the two women at the time of the murder. **See** N.T. Trial, 5/20/13, at 247.

written statement. Appellant's Brief at 18. Appellant specifically asserts that the PCRA court erred in concluding that evidence of Detective Pitts' behavior in other cases was not admissible in the instant case. *Id.* at 18-19. Appellant argues that the evidence of Detective Pitts' record in other cases would be admissible as rebuttal evidence of Detective Gaul's testimony regarding the character of Detective Pitts. *Id.*

The PCRA court, when dismissing this claim, opined:

> [Appellant] alleges that trial counsel failed to introduce corroborating evidence tending to prove that Detective James Pitts threatened and choked Cunningham in order to elicit a statement. Cunningham testified that Pitts choked him in both direct and cross-examination. [Appellant] claims that two homicide cases . . . were dismissed because witnesses were choked by Detective Pitts. [Appellant] argues that trial counsel was unaware of these cases, and had he brought them up, [Appellant] would have been acquitted.

> [Appellant] fails to demonstrate that such evidence is relevant and admissible. Detective Pitts did not interview Cunningham, he did not record Cunningham's statement, nor did he testify at trial, precluding introduction on an impeachment basis. If such evidence were offered to show that Pitts did in fact choke [other defendants], it would be precluded as inadmissible hearsay. Moreover, the Petitioner cannot demonstrate prejudice. Trial counsel effectively and reasonably raised the issue. Not only did Cunningham testify that Detective Pitts choked him, but trial counsel elicited further evidence of Pitts' abuse while cross-examining Cunningham, Detective Gaul, and Detective Verrecchio. Trial counsel's examination permitted the jury to infer that Detective Pitts may have coerced Cunningham, but they found the Petitioner guilty regardless.

PCRA Ct. Op., 10/24/16, at 22 (footnotes and record citations omitted).

Following our review, we agree with the PCRA court's cogent analysis. Of note, the PCRA judge in this case also presided over trial and was able to

make factual findings and credibility determinations based on the existing record that Cunningham did not encounter Detective Pitts. *See Franklin*, 990 A.2d at 797. Thus, we discern no basis upon which to disturb its ruling.[18]

## 2. Trial counsel's failure to object to the prosecutor eliciting hearsay evidence of Decedent's then existing state of mind

Appellant's next issue focuses on trial counsel's failure to object to testimony regarding statements Decedent made before he was killed. According to Appellant, trial counsel's omission permitted the Commonwealth to introduce hearsay evidence that resulted in prejudice.

The background to this claim is as follows. Lisa Hall testified for the Commonwealth that she spoke with Decedent on the telephone approximately two hours before Decedent was shot. Hall and Decedent discussed the prior home invasion during which Decedent's nephew, Rahsul Isaacs, was rumored to have shot Lekkir Brown. *See* N.T., 5/21/13, at 263. Hall further testified that Decedent told her he "was kind of leery about going out to the project because of what [Kamac] had said to him and the young guys that was out there." *Id.*

---

[18] Appellant has also filed an application to vacate and remand based on after-discovered evidence related to this claim. Specifically, he references additional evidence regarding Detective Pitts, namely, that a court has reviewed Detective Pitts' internal affairs file and that another PCRA petitioner obtained a new trial in a case in which the detective was involved. However, given the PCRA court's factual findings and determinations of credibility based on the existing record, this additional evidence does not warrant relief.

Appellant, in his *pro se* PCRA petition, alleged that trial counsel should have objected to Hall's testimony that Decedent was afraid as hearsay. PCRA Pet., 6/15/15, at 36. PCRA counsel, when seeking leave to withdraw from representation, asserted that Appellant's claim was meritless because Hall's testimony fell within the state of mind exception to the general rule against hearsay. **Finley** Ltr., 6/11/16, at 5 (unpaginated).

The PCRA court dismissed Appellant's claim on an alternative basis. The court reasoned that Decedent's statements were admissible because the "evidence was not offered for the truth of the matter, but rather to establish [Appellant's] motive[.]" PCRA Ct. Op., at 9-10. Thus, the court concluded that trial counsel had no basis to object.[19]

Appellant presently argues that the PCRA court's rationale is unsustainable. In support, Appellant relies on **Commonwealth v. Moore**, 937 A.2d 1062 (Pa. 2007). Appellant's Brief at 21.

It is well settled that "[h]earsay is an out-of-court statement offered to prove the truth of the matter asserted" and is generally inadmissible. **See Commonwealth v. Puksar**, 740 A.2d 219, 225 (Pa. 1999) (citation omitted).

> When an extrajudicial statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule. Thus, statements are

_____

[19] The PCRA court specifically rejected PCRA counsel's assertion that the testimony regarding Decedent's statements were admissible under the "state of mind" exception to the rule against hearsay. **See** PCRA Ct. Op. at 10 n. 2.

admissible to establish ill-will or motive where they are not being offered for the truth of the matter contained therein.

*Id.*

In **Commonwealth v. Moore**, 937 A.2d 1062 (Pa. 2007), however, the Pennsylvania Supreme Court determined that a victim's statement that was admitted as "circumstantial evidence to establish the victim's fear," and establish the defendant's motive was inadmissible. **Id.** at 1072. In **Moore**, the Court concluded was statements of the victim that the defendant bullied him was "plainly relevant to [the defendant]'s motive only to the degree that the hearsay statements were true." **Id.**

In light of the foregoing, we agree with the PCRA court that Decedent's statement regarding the prior shooting of Lekkir Brown and the rumor that Decedent's nephew was responsible for the shooting of Lekkir Brown was not hearsay. The truth of those matters were not at issue and, therefore, did not constitute hearsay. **See Puksar**, 740 A.2d at 225.

Decedent's statements that he was in a confrontation with Kamac and was fearful of going out into the neighborhood, however, fall closer to **Moore** than **Puksar**. The motive or ill-will asserted by the Commonwealth in this case depended on the truth of Decedent's statement that the confrontation occurred. **See Moore**, 937 A.2d at 1072.

Nevertheless, unlike **Moore**, Decedent's statements regarding the confrontation with Kamac, Lekkir Brown's son, did not directly implicate Appellant in any prior bad acts or wrongdoing. Moreover, the fact that Kamac

- 17 -

confronted Decedent about the prior shooting of Lekkir Brown was undisputed and was essential to the defense's theory that Kamac had a greater motive to kill Decedent that Appellant. Under these circumstances, we cannot conclude that the error in admitting Decedent's statement resulted in a reasonable probability that the outcome at trial would have been different. Thus, this claim of ineffective assistance of counsel did not warrant relief. **See Franklin**, 990 A.2d at 797; **Wiley**, 966 A.2d at 1157.

### 3. Trial counsel's failure to object to the prosecutor eliciting hearsay evidence of threats, arguing with a witness, improper bolstering, the trial court giving a faulty instruction and allowing threat evidence

In his next issue, Appellant claims that the PCRA court erred in rejecting his ineffectiveness claims as to: (A) the prosecutor's references to threats during the examination of Cunningham and Respes, the two witnesses who provided statements to the police, (B) the trial court's cautionary instructions, (C) hearsay evidence regarding threats against Respes that were introduced through the relocation coordinator Tobi Downing, and (D) the prosecutor's "arguing" with Cunningham.[20]  **See** Appellant's Brief 19-27.

(A)    Threats

_____

[20] We have reordered the presentation of Appellant's arguments in support of this issue.

As to the prosecutor's references to threats against Cunningham and Respes, Appellant cites to the following portions of the Commonwealth's direct examination of Cunningham:

> [Prosecutor]     Okay.  Didn't you tell me in my office on Friday that [Appellant's] brother, Gunna Ish, that goes by that nickname, Gunna Ish, threatened Aaron [Respes]?
>
> [Cunningham]     No.
>
> Q     You didn't tell me in my office that [Appellant's] brother told Aaron, if he does time, then Aaron's dead?
>
> A     No.

N.T., 5/20/13, at 227.

Appellant also refers to the following portions of the Commonwealth's direct examination of Respes regarding the events after Respes testified at the preliminary hearing:

> [Prosecutor]     Okay. How about when you were leaving the courthouse with the detectives.
>
>      Did you see people from Wilson [Park] outside the room?
>
> [Respes]     No.
>
> Q     How about outside the courthouse?
>
> A     No.
>
> Q     Nothing?
>
> A     No.  You can't see out of those curtains.
>
> Q     I'm talking about when you were walking out with detectives over to my office.
>
>      Do you remember that?
>
> A     No.

- 19 -

Q    You don't remember?

A    Yeah, I remember walking over, but I didn't see anybody from Wilson.

Q    You don't remember anyone yelling "snitch" when you were walking with the detectives?

A    No.

Q    Do you remember why you went to my office after?

A    No.

Q    Do you remember that you got interviewed for possible relocation?

* * *

[Prosecutor]    Do you know the [Appellant's] brother, Ishmael Goodwin?

[Respes]    Yes.

Q    Does he have a nickname?

A    Ish.

Q    Okay.  Do they call him Gunna Ish or just Ish?

A    Ish.  I call him Ish.

Q    Okay.  He never threatened you?

A    No.

Q    Never said that if his brother does time, you're going to get killed?

A    No.

Q    Do you see Ish in the courtroom?

A    Yes, he's right there.

Q    What color shirt is he wearing?

A    Blue.

Q    The second row of people in that light blue shirt right there?

A    Yes.

Q    That's [Appellant's] brother?

A    Yes.

Q    Okay.  Do you see other people in the neighborhood from Wilson?

A    Yes.

N.T., 5/21/13, at 138, 146-47.

Appellant asserts that the PCRA court erred in concluding that the prosecutor's references to threats were introduced to explain Cunningham's and Respes' recantation at trial.  Appellant insists that this evidence was introduced to allege that he and his brother intimidated witnesses and to establish consciousness of guilt.  He further contends that the testimony regarding threats was unreliable because both Cunningham and Respes testified at trial that they were not threatened.  Appellant's Brief at 22-23.

We have reviewed the record and discern no merit to Appellant's claim. Although a variety of threat evidence was presented at trial and referred to by the Commonwealth, the evidence was admitted to explain Cunningham's and Respes' recantations of their statements to the police.  **See Commonwealth v. Ragan**, 645 A.2d 811, 824 (Pa. 1994) (indicating that where the purpose of introducing threat evidence is not to establish guilt, but to explain a prior inconsistent statement, it is a permissible use).  Indeed, the trial court issued a cautionary instruction to this effect and clearly stated that the only purpose of the evidence of threats against Cunningham and Respes

was for assessing the credibility of their trial testimony.[21]  N.T. Trial, 5/28/13, at 113; *see Commonwealth v. Mason*, 130 A.3d 601, 673 (Pa. 2015) (reiterating that "[j]uries are presumed to follow such instructions").  Thus, we discern no basis to disturb the PCRA court's ruling that the threats evidence was admissible and that trial counsel had no basis to object.

(B)   Cautionary instructions

Appellant also complains that the trial court's cautionary instructions implicated him in the threats against and that trial counsel should have objected.  As noted above, the Commonwealth referred to threats during its direct examination of Cunningham and Respes.  However, both Cunningham and Respes denied the allegations that threats were made.  Additionally, Respes specifically denied hearing any threats after his preliminary hearing or seeing any individuals from the Wilson Park neighborhood at the preliminary hearing.

The Commonwealth, however, subsequently called Detective Gaul.  Detective Gaul testified, in part, that Aaron Respes appeared fearful when entering and leaving the courtroom.  Detective Gaul further testified that after Respes testified at the preliminary hearing, the detective and Respes were

---

[21] The entire cautionary instruction issued by the trial court is reproduced below in connection with Appellant's separate challenge to the instruction itself.  Moreover, we note that the court did not issue a consciousness of guilt instruction.

walking through the hallway of the courthouse to go to the District Attorney's office. N.T., 5/22/13, at 48. Detective Gaul continued:

> Basically, after we passed through, like, you know, it was a large crowd. But as you're walking through the crowd, you can't see who's yelling stuff, but they're yelling at [Respes], you know, snitch, things of that nature. And we're just trying to get him through the crowd and get him over the District Attorney's Office, but he was visibly shaken by what was going on.

*Id.*

In its charge to the jury, the trial court issued the following cautionary instruction:

> You also heard evidence throughout the course of this trial about alleged intimidation and/or threats. I want to point out to you that the only specific evidence that you had in this case was that someone shouted out after the preliminary hearing a Mr. Respes was walking down the hall, called him a name, and I believe it was a snitch.
>
> **Now, first of all, there's no evidence that that was done on the defendant's behalf or clearly it was not done by the defendant**. But this evidence is before you for, once again, a limited purpose, and that is that the evidence of the calling out of the name and any other evidence concerning possible intimidation or about any of the witnesses in this case, this evidence is before you for a limited purpose, and that is for the purpose of helping you in assessing the credibility of Mr. Cunningham and Mr. Respes. It must not be considered by you in any way other than the purpose for which I stated. It's one factor that you use when you determine the credibility and weight of each of the witnesses.

N.T., 5/28/13 at 112-13 (emphasis added).

Appellant complains that by referencing the evidence that someone yelled "snitch," the trial court improperly suggested that Detective Gaul's version of the events at the preliminary hearing were credible. Appellant's

Brief at 25. Appellant further suggests that the instruction insinuated that Appellant was connected to the threats. *Id.* He asserts that the trial court should have stated that there was no evidence linking Appellant to the threats and then stopped. *Id.* Thus, Appellant asserts that trial counsel was ineffective for failing to object to the instruction, and that the PCRA court erred in dismissing this claim as meritless.

Following our review, we agree with the PCRA court that this claim relies on a strained reading of the cautionary instruction, which was proper in all respects. The trial court accurately indicated that there was evidence that an unknown individual called Respes a snitch. The trial court further made clear that Appellant was not linked to the name calling or any threats. Thus, the PCRA court properly concluded that Appellant's assertion that the instruction was improper lacked arguable merit.

### (C)    Testimony of Tobi Downing

Appellant next claims that trial counsel was ineffective for failing to object to the testimony of the relocation coordinator Tobi Downing, who discussed her two meetings with Respes after Respes testified at the preliminary hearing. Appellant argues that the Commonwealth elicited hearsay statement from Respes and improperly bolstered Respes' prior statement to the police. Appellant contends the admission of those statements violated *Crawford v. Washington*, 541 U.S. 36 (2004). Appellant further contends that Ms. Downing's testimony improperly bolstered

the "fear factor" emphasized by the Commonwealth throughout trial. Appellant's Brief at 24.

However, the record indicates that the Commonwealth did not elicit Tobi Downing's testimony regarding statements made by Aaron Respes. Rather, Downing testified to the facts regarding their meetings after Respes testified at the preliminary hearing. Moreover, Respes was available for cross-examination by Appellant. In any event, Appellant appears to suggest that Downing's testimony was unreliable because Respes, at trial, testified he denied relocation services at the first meeting with Downing and only appeared to accept relocation services at the second meeting to assist his mother. Such evidence was admissible for the purposes of impeachment to explain Respes' recantation. Therefore, Appellant fails to establish any arguable merit to his claim that trial counsel should have objected to Downing's testimony.

(D)   Arguing with a Witness

Appellant next contends that trial counsel was ineffective for failing to object to the prosecutor's examination of Cunningham regarding the meeting between the prosecutor and Cunningham shortly before trial.

By way of background, Detective Verrecchio described the meeting as follows. Cunningham was with the prosecutor in the prosecutor's office and was "cooperative and forthcoming." N.T., 5/22/13, at 154. According to the detective, at some point during the meeting, Cunningham accessed Facebook on the prosecutor's computer and identified individuals from pictures on

Facebook. *Id.* at 155. Copies of those pictures were printed at that time. At trial, they were marked as exhibits, and published to the jury.

Appellant's claim arises out of the following portion of the Commonwealth's direct examination of Cunningham:

[Prosecutor]     And when you were in my office, do you remember talking with me in front of Detective Verrecchio?

[Cunningham]     Yeah. He was asking me why I didn't come to court and stuff.

Q     And we also went over what happened the night of the murder; right?

A     Yes.

Q     And you told me everything that you saw, and what you told me was consistent with this statement; right?

A     No. I told you that I was on Taney Terrace.

Q     Are you telling me that in my office with Detective Verrecchio you didn't tell me how this defendant committed this murder?

A     I told you I was on Taney Terrace.

Q     You're not answering my question.

A     You never said nothing about that. You said, What happened? And I told you I was on Taney Terrace. And then you started going into the statement and stuff, and that was about it.

Q     Actually, I never showed you your statement when you were there. You didn't show me the statement. You started talking about it.

Q   I asked you what happened, and you told me that [Appellant], Gunna, committed the shooting and you saw it; right?

A     I did not say that.

Q     You didn't say that?

A     No.

Q    Well, you sat down, in fact, at my computer and started printing out Facebook pictures of everyone, didn't you?

A    No.  You went on my Facebook.

THE COURT:    She went on your Facebook?

[Cunningham]:    Yes.  She asked me to log in.  And I logged in for her, and she went on my Facebook.

THE COURT:    Was there a detective there?

THE WITNESS:    He was in and out.  He was in and out.

THE COURT:    Okay.  Go ahead.

***

Q    All right.  Well, let me ask you this:  You have a Facebook page?

A    Yes.

Q    Is there a password for your Facebook page?

A    Yes.

Q    And on last Thursday, after you repeated the whole murder that you witnessed, you said, I'll even show you some pictures of everyone on Facebook, and you showed them to me, didn't you?

A    No.  I gave you my password.  You went through it, and I was sitting in the chair.  And that's when you offered to buy me soup.

Q    To buy you soup?

A    Yes.

Q    Are you saying that you only gave me Facebook pictures because I bought you soup?

A    No.

Q    You didn't eat all night overnight, did you?

A    I didn't eat since I was locked up.

Q      You told that your stomach hurt and you didn't want to eat; right?

A      I told you I was cool.  You kept offering to buy me soup. You said you was going to go get it.

Q      All right.  Am I supposed to let you starve in my office?

A      No.

N.T., 5/20/13, at 206-08.

According to Appellant,

The prosecutor sought to bolster the witness['] out-of-court police statement by arguing with Mr. Cunningham about things the witness allegedly said to her out of court. The prosecutor claimed that Mr. Cunningham told her exactly what [i]s in his police statement when they were at her office. The witness claimed that he told her exactly what [i]s in his affidavit taken by the defense investigator. The prosecutor continued to argue with the witness and insinuated the witness is lying. The prosecutor presented no evidence, not even in the form of a written statement or recording of that interv[ie]w. The prosecutor then argued with the witness about [F]acebook pictures. The witness claimed that the prosecutor went through his [F]acebook page and the prosecutor claim[ed] that the witness gave her the pictures. Through the course of them arguing about who printed the pictures, the prosecutor is calling the witness a liar and claiming that he identified peo[pl]e to her personally. Also, the [t]rial [c]ourt had to stop the prosecutor from bullying the witness.

Trial counsel['s] failure to object was not the result of any strategy. [T]rial counsel allowed the prosecutor to inject facts outside the record to allege [A]ppellant's guilt. Moreover[,] the prosecutor undermined Mr. Cunningham's credibility. The prosecutor offered no evidence of proof and this misconduct was seen by the jury as the prosecutor['s] own personal[] opinion of the witness.

Appellant's Brief at 23-24.

Even if trial counsel could have objected to the manner of the prosecutor's questioning of Cunningham, the exchange did not affect a fair consideration of Respes' prior statements identifying Appellant as the shooter. Therefore, under the totality of the circumstances of this case, Appellant has failed to demonstrate that there was a reasonable possibility that the jury would have found Appellant not guilty had trial counsel objected to this exchange. *See Franklin*, 990 A.2d at 797; *Wiley*, 966 A.2d at 1157.

### 4. Trial counsel's ineffectiveness for opening the door to numerous instances of prejudicial testimony

Appellant, in his next issue, asserts that the PCRA court erred in dismissing his claims that trial counsel "opened the door" to irrelevant and prejudicial testimony. Appellant specifically argues that trial counsel was ineffective for eliciting (A) references to anonymous tips identifying Appellant as the killer; (B) references to Raheem Zachary's oral statement to police; (C) statements referring to Appellant's prior possession of a firearm; and (D) Appellant's statement to Detective Verrecchio that he used "Xannies." Appellant's Brief at 27-31, 32-35.

(A)    Anonymous Tips

As to Appellant's argument as to anonymous tips received by police, the record reveals the following. During cross-examination of Detective Gaul, trial counsel inquired: "What did you do to find out the who, what, when, and why[]" of the shooting. N.T., 5/22/13, at 50. Trial counsel then asked where the detective obtained information that Appellant was an associate of Lekkir

Brown and the alleged motive for the shooting of Decedent. *Id.* at 52. The detective responded that "it was through, like, anonymous tips and investigation, you know, as far as motive and what was done throughout the investigation and what the investigation led to." *Id.*

Additionally, trial counsel posed the following question to Detective Gaul: "You told the ladies and gentlemen of the jury that immediately there were anonymous tips coming into the police department about who did it and what happened; right?" *Id.* at 68. The detective responded:

> Just anonymous tips coming into the Homicide Unit. Our general number is (215) 686-3334 or 3335, also 3336. I'm sorry. And people would call and say, Look, I know who did that shooting out there. They wouldn't say how they know who did it, but they would supply a name or nickname. And all the consistent tips were Gunna. That's what we had at first.

N.T., 5/22/13, at 69.

The record also reveals that the trial court later cautioned the jury on the use of the reference to the anonymous tips during the presentation of the Commonwealth's evidence:

> Members of the jury . . . I'm telling you, this morning you heard a lot of testimony about information from anonymous sources and what things normally happen.
>
> I ruled about in response to rumors and alleged retaliation and intimidation of witnesses. I'm going to give you specific charges or instruction in reference to that before you begin your deliberations, but I just want to remind you that this is not really being offered for the truth of the matter in certain instances, but it's being offered to challenge the credibility of certain witnesses.
>
> And I just want to let you know that you will get more specific instructions on that later because, generally speaking, what other

- 30 -

people said isn't before you for the truth of the matter. That's why we have the witnesses come to court and testify. But right now, for instance, with the detectives, part of what's going on is there's a question about what they did or why they did something and not other things. So some of that comes in for that purpose only and not for the truth of the matters.

So about the rumors, we have trials. We don't convict people on rumors. That's why we have trials and we have live witnesses. By live witnesses, I mean people that come in and testify in front of you.

N.T., 5/22/13, at 173-74. As noted above, the trial court repeated a similar instruction in its final charge to the jury.[22] **See** N.T., 5/28/13, at 111-12.

Appellant presently asserts that the references to the anonymous tips identifying him as the shooter constituted hearsay evidence and violated his confrontation rights. **Id.**

As noted above, "an extrajudicial statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule." **Puksar**, 740 A.2d at 225 (citation omitted). Moreover, even if inadmissible hearsay is admitted at trial, a cautionary instruction can dispel the prejudice as it is presumed that the jury followed the trial court's instructions. **Commonwealth v. Bedford**, 50 A.3d 707, 713 (Pa. Super. 2012) (*en banc*).

Instantly, the information contained in the anonymous tips were not admitted for the truth of the matter contained in the tips. **See Puksar**, 740

---

[22] The cautionary instruction in the trial court's final charge is reproduced above in conjunction with Issue 3(B).

A.2d at 225. Additionally, the trial court's careful instructions belie Appellant's assertions that he suffered prejudice as a result from the remarks that the tips identified him as the shooter. *See Bedford*, 50 A.3d at 713. Therefore, no relief is due based on this claim.

(B)    Raheem Zachary's statement

Appellant next argues that the trial counsel was ineffective for opening the door to references to Raheem Zachary's oral statement to the police. Appellant's Brief at 32. Appellant's argument arises out of trial counsel's cross-examination of Detectives Gaul and Verrecchio regarding their efforts to corroborate Cunningham's statement to police. For example, during the cross-examination of Detective Gaul, trial counsel engaged in the following exchange:

[Trial counsel]    In Mr. Cunningham's statement, he said he went to a lady's house by the name of Theresa; remember that?

[Detective Gaul]  Yes, sir.

Q      Anybody try to find Theresa?

A      I believe that --

Q      Try and corroborate that that's where he was and that's what he did?

A      That may have been attempted. I know we did -- the main person that I know that we contacted to try to corroborate was Raheem Zachary.

Now, our contact with him was documented within an activity sheet that I believe was dated -- I believe it was filled out on July 30, and he was brought into the Homicide Unit on July 27. He refused to go on paper, but he also supplied information. I mean, if you're asking for documentation, I believe that activity sheet's within the file.

Q    I've seen that.

A    Okay.

Q    But I'm talking about Mr. Cunningham's statement because Mr. Zachary didn't give you a statement; right?

A    Well, Mr. Zachary is mentioned in Mr. Cunningham's statement, I believe, as far as being out there.

Q    I understand.

A    There were attempts made. As far as, like, Theresa that was mentioned, I might not have been the detective that went out and spoke with Theresa or maybe tried to locate Theresa, but it might have been done.  Again, as far as my knowledge, you know, it could have been done; it couldn't have been done.  I wouldn't be able to tell you.

N.T., 5/22/13, at 72-73.

Moreover, during trial counsel's cross-examination of Detective Verrecchio, the following exchange occurred:

[Trial counsel]    Well, to corroborate what Mr. Cunningham said. He said that at least when he was giving his narrative, according to this interview about what happened, he said he was in the speakeasy.  He was in the speakeasy with my client.  He didn't know my client had left the speakeasy, and identified him as a shooter, at least in this interview.

[Detective Verrecchio]    Well, there's a lot of other corroboration in the interview.  We don't go out and corroborate every little detail that somebody would tell us.  What we do is we corroborate what they're saying, and he gave a lot of corroborative information during the course of the interview that definitely had the ring of truth.

Q    Definitely had the ring of truth?

A    Yes, sir.

Q    Like Aaron Respes was sitting on a bench at the circle?

A    Yes, with Zachary, Raheem Zachary.

Q      Yeah.

A      He was sitting on the bench with him.

Q      So he would have been -- both Aaron and Zachary would have been in the circle at the time that [Decedent] was shot?

A      That's correct.

Q      And that had the ring of truth to you?

A      **Yes, it did.  Raheem Zachary told us he was in the circle with him.**

Q      Did you write that down anywhere?

A      I believe it's in an activity sheet.

Q      Did you do a formal interview with Mr. Zachary when he told you that?

A      No.  He refused to provide a written interview.

*Id.* at 180-81 (emphasis added).

Appellant disputes the PCRA court's conclusion that Appellant could not establish prejudice because the contents of Zachary's statement were not revealed at trial.  Appellant's Brief at 32.  Appellant asserts that trial counsel elicited hearsay statements by Zachary that bolstered the Commonwealth's case and undermined the in-court testimony of other witnesses.  *Id.* at 33.  Appellant further suggests that trial counsel's reference was prejudicial because it permitted the jury "to infer that . . . Zachary had harmful information[.]" *Id.* at 32.

We agree with the PCRA court that Appellant failed to establish a basis for relief, albeit on different grounds.  *See Wiley*, 966 A.2d at 1157.  With respect to Detective Gaul's testimony, the record establishes that Detective

Gaul did not testify as to the contents of Raheem Zachary's oral statement to police. Therefore, Appellant's assertion that trial counsel permitted Detective Gaul to present hearsay evidence lacks arguable merit.

Detective Verrecchio, however, testified to a portion of Raheem Zachary's statement. Even assuming that trial counsel should have stricken or otherwise challenged the detective's testimony, the passing reference to Zachary's statement was not so inflammatory that the jury could not fairly decide Appellant's guilt or innocence in this case. Appellant's boilerplate contention that the jury could have concluded that Zachary implicated Appellant is too speculative to warrant relief.[23] Furthermore, as noted above, although Detective Verrecchio's unsolicited testimony could be read to corroborate Cunningham's testimony, the jury also had Respes' prior statement identifying Appellant as the shooter. Therefore, we decline to disturb the PCRA court's ruling on this argument.

(C)  Testimony referring to a firearm that admitted Appellant's guilt

Appellant argues that trial counsel posed a question that conceded Appellant's guilt regarding possession of the murder weapon or a prior bad act. Appellant's Brief at 33-34. During the Commonwealth's direct examination of Detective Verrecchio, the Commonwealth presented evidence that a search warrant was not obtained for Appellant's residence. The

_____

[23] Raheem Zachary did not place Appellant at the scene of the murder, but asserted he did not see the shooter.

Commonwealth elicited the detective's testimony to explain the decision not to seek a search warrant for the murder weapon at the time of Appellant's arrest. Specifically, the Commonwealth adduced testimony that it would be unlikely that Appellant would still have the murder weapon at the time of his arrest approximately one month after the shooting.

The challenged testimony arose during the following exchange between trial counsel and Detective Verrecchio regarding the failure of investigators to seek a search warrant for Appellant's residence:

> [Trial counsel]    But let me ask you this. You wouldn't know whether there was a gun present or not unless you looked; right?
>
>     In this case, this case, **you wouldn't know whether [Appellant] is dumb enough to leave a gun someplace unless you look; right**?
>
> [Detective Verrecchio]  There was information that came to light about a weapon.

N.T. 5/22/13, at 231 (emphasis added).

The PCRA rejected Appellant's argument, opining that "trial counsel clearly sought to raise an inference of reasonable doubt by challenging the thoroughness of the Commonwealth's investigation into the murder weapon." PCRA Ct. Op. at 16. The court further concluded that Detective Verrecchio appropriately indicated and later explained at a sidebar conference that his reference to "information . . . about a weapon" could have introduced evidence of a prior, unrelated charge for possession of a firearm. *Id.* at 15.

- 36 -

Instantly, we agree with the PCRA court that Appellant's narrow focus on trial counsel's question to assert that counsel conceded his guilt did not warrant relief. Trial counsel question to the detective—"you wouldn't know whether the defendant is dumb enough to leave a gun someplace unless you look"—was not a concession of guilt but a challenge to the adequacy of the investigation, in particular, the decision not to seek a warrant for Appellant's home.

With respect to Appellant's challenge to Detective Verrecchio's testimony that he received information about "a weapon," the record establishes that Detective Verrecchio mistakenly believed that Appellant had been charged with possessing a firearm between the murder of Decedent and the time of his arrest. However, Appellant was charged with possession of a firearm well before the murder.[24] Even assuming that trial counsel should have moved to strike Detective Verrecchio's testimony, Appellant cannot establish prejudice as trial counsel subsequently elicited the detective's concession that a murder weapon in this case was not found. N.T., 5/22/13, at 235. Thus, we discern no basis upon which to conclude that this passing reference resulted in prejudice.

      (D)   <u>Appellant's statement that he used "Xannies"</u>

---

[24] Appellant also challenges Detective Verrecchio's reference to receiving information about a weapon in his claim that the prosecution knowingly introduced false information. As discussed below, we find no merit to this claim.

Appellant, in support of his claim that trial counsel improperly opened the door to Appellant's drug use, refers to the following excerpt of trial counsel's cross-examination of Detective Verrecchio regarding the quality of the investigation and whether there was corroboration of Cunningham's statement to police:

> [Trial counsel]   Okay.   Now, you said there was a lot of corroboration in Mr. Cunningham's statement. Are you telling the ladies and gentlemen of the jury that the fact that he said he went to the speakeasy wasn't that important to check whether or not that occurred?
>
> [Detective Verrecchio]   I'm not telling the ladies and gentlemen of the jury that it's not important.   What I'm saying to you is that there is a lot of corroboration in the interview.   If you give me one second, I'll point all the corroboration out for you.
>
> Q      Okay.
>
> A      He says Gunna was the person who did it, and he knew his first name was Chris.   That was corroborated.
>
> Q      What did that corroborate?
>
> A      Gunna's nickname and his real name is Christopher.   So that's corroborated.
>
> Q      That his name was Gunna?
>
> A      No, that he knew him as Gunna but his real name is Chris. That's true.
>
> Q      Everybody in the neighborhood knows that; right?
>
> A      You're asking me what's corroborated.   It's a true statement.
>
> Q      Okay.  Right.
>
> A      I'm telling you what –
>
> Q      Go ahead.  I'm sorry.  Go ahead.

A      I was walking.  I saw [Decedent] and he was ahead of me and he was walking through the circle.  [Decedent] was walking through the circle because that's where he was killed.

Q      Well, okay.  Go ahead.

A      Gunna hopped the fence by an alleyway. There is a fence there in the alleyway.

Q      Okay.

A      He didn't realize he left the speakeasy.  Gunna stopped first and was talking to two boys who were sitting on the bench. We've identified them as Raheem and Aaron.  He was asking them if they had any Xannies.  **We know he uses Xannies**.

Q      **Who do you know uses Xannies?**

A      **Gunna, your client.**

Q      **Oh, did he tell you that?**

A      **Yes.**

Q      **When did he tell you that?**

A      **When he was arrested.**

N.T., 5/22/13, at 183 (emphasis added).  Trial counsel continued to question the detective regarding Appellant's alleged use of "Xannies" to emphasize that the detective did not document Appellant's statement in any reports.  *Id.* at 183-84.

The trial court called a recess and convened a sidebar conference.  At the conference, trial counsel indicated that he had spoken with Appellant many times and that he was "almost positive" that Appellant "didn't say that" to the detective.  N.T., 5/22/13, at 188-89.  The court called Detective Verrecchio to clarify the circumstances under which Appellant allegedly made the statement to the detective.  According to the detective, after Appellant's arrest,

it was explained to him what he was there for, and he was just, like, I just do my Xannies. It was kind of, like, just blowing everything off.

*\*\**

It was more like, I didn't kill nobody. I just do my Xannies. I ain't sweating this.

*Id.* at 193.

Further discussions at the conference ensued about whether the testimony violated Appellant's right to post-arrest silence. Trial counsel then requested that the detective's testimony regarding be stricken. The trial court granted the motion, and when the jury returned from lunch, the court issued the following instruction:

[M]embers of the jury, before lunch, you may have heard a comment about [Appellant] allegedly made that he, in fact, uses Xannies.

That comment is stricken from the record, so if anyone wrote it down, you have to strike it because you treat it as if it was never said.

*Id.* at 198.

The PCRA court concluded Appellant's argument was meritless. According to the court, trial counsel did not reveal that Appellant had a drug problem and reasonably used the testimony to challenge the thoroughness of the investigation. PCRA Ct. Op. at 14.

Appellant now contends that his claim has arguable merit because trial counsel examination led to Detective Verrechio confirming that Appellant used "Xannies." Appellant asserts that trial counsel's decision to ask who used

Xannies was unreasonable because trial counsel did not know the answer. Lastly, Appellant states that trial counsel's more extended examination regarding Detective Verrecchio's testimony was prejudicial because it corroborated Cunningham's statement to police that Appellant asked for "Xannies" before the murder and it implicated him in prior bad acts.

Contrary to Appellant's arguments, trial counsel did not "open the door" to the references to "Xannies." Rather, the implications of drug use were raised in Cunningham's statement to the police and then in Detective Verrecchio's narrative testimony regarding points of corroboration. Thus, Appellant's assertion that trial counsel was ineffective for "opening the door" to the issue of drug use lacks arguable merit.

Appellant further argues that he was entitled to relief because trial counsel failed to move for a mistrial. However, in light of the trial court's striking the offending testimony and issuing a limiting instruction, we discern no basis to conclude that the trial court would have granted such a motion. Therefore, Appellant has not established arguable merit to his argument that he was entitled to a mistrial.

In any event, having reviewed the entirety of the trial record, we conclude that Appellant cannot establish prejudice based on the Detective Verrecchio's testimony referring to Appellant's statement at the time of arrest. As noted previously, even if the reference to Appellant's use of "Xannies" improperly bolstered Cunningham's statement identifying Appellant as the

shooter, the jury was still entitled to credit Respes' prior statement. Therefore, no relief is due.

### 5. Direct appeal counsel's failure to challenge hearsay evidence

Appellant, in his next issue, claims that the PCRA court erred in concluding that there was no merit to the claim that his direct appeal counsel was ineffective for failing to challenge the admission of hearsay evidence based on the references to anonymous tips. Appellant's Brief at 31. This claim is related of Appellant's assertion that trial counsel was ineffective for opening the door to such evidence, which was discussed in issue 4(A). In any event, our review reveals that trial counsel did not object to the testimony regarding anonymous tips or otherwise preserve this issue for review on direct appeal. *See* 42 Pa.C.S. § 9544(b); *Commonwealth v. Blakeney*, 108 A.3d 739, 777 (Pa. 2014). Accordingly, Appellant's claim that direct appeal counsel was ineffective for raising this claim lacks merit.

### 6. Trial counsel's failure to object to or request a mistrial for discovery violations

Appellant's next issue focuses on the PCRA court's dismissal of his claims that trial counsel should have objected to and requested a mistrial due to alleged discovery violations. In support, he refers to (1) the relocation paperwork completed by Aaron Respes, (2) the anonymous tips, (3) threats against witnesses; (4) Decedent's statements to Hall; and (5) Appellant's statement to Detective Verrecchio that Appellant used "Xannies."

Pennsylvania Rule of Criminal Procedure 573 provides, in relevant part, that "the Commonwealth shall disclose to the defendant's attorney . . . any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(b). This Court has held that an inculpatory statement made to a police investigator, but not in the possession or control of the attorney for the Commonwealth is not subject to disclosure under Pa.R.Crim.P. 573(B)(1)(b). *See Commonwealth v. Sullivan*, 820 A.2d 795, 804 (Pa. Super. 2003). *But see Commonwealth v. Burke*, 781 A.2d 1136, 1142 (Pa. 2001) (discussing exculpatory information known to police but not within the possession of the Commonwealth).

Moreover, the remedy for an alleged violation of the rules of disclosure are discretionary with the trial court. *Burke*, 781 A.2d at 1143. It is further well established that:

> [a] motion for mistrial is a matter addressed to the discretion of the court. A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial.
>
> A mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

> The law presumes that jurors will follow the trial court's instructions.

*Commonwealth v. Gillen*, 798 A.2d 225, 231 (Pa. Super. 2002) (citations omitted).

With respect to Appellant's first four arguments, Appellant fails to establish that the Commonwealth did not disclose the information or material. Therefore, Appellant claims of ineffectiveness fail for lack of arguable merit.

As to Appellant's fifth argument, regarding Detective Verrecchio's testimony that Appellant told the detective that Appellant used "Xannies," Appellant fails to demonstrate that this information resulted in prejudice. As noted above, the testimony was stricken and the trial court issued an instruction for the jury to disregard the reference. *See Gillen*, 798 A.2d at 231.

### 7. Trial counsel's failure to elicit testimony that Kamac was a possible shooter by impeaching witnesses

Appellant, in his next issue, claims that the PCRA court erred in dismissing his assertion that trial counsel failed to cross-examine Detective Gaul with alleged exculpatory evidence that Kamac shot Decedent. Appellant's Brief at 38-39. According to Appellant, the PCRA court misconstrued his claim. Specifically, he argues that that the PCRA court focused on trial counsel's impeachment of Detective Gaul using evidence that Kamac threatened Decedent before the shooting. He contends his present claim is based on trial counsel's failure to confront the detective with evidence that others named Kamac as the shooter.

However, as noted above, Appellant does not establish the existence of any admissible exculpatory evidence that Kamac shot Decedent.[25] Additionally, Appellant fails to establish any prejudice resulting from trial counsel's failure to confront Detective Gaul with evidence that there were rumors that Kamac shot Decedent, where trial counsel cross-examined the detective about Kamac's stronger motive to kill Decedent.

## 8. Trial counsel's failure to object to the prosecutor's numerous frauds upon the court

Appellant's next issue relates to his allegations that the Commonwealth admitted false evidence, namely: (1) threats against Respes and (2) Detective Verrecchio's reference to receiving information regarding the murder weapon. Appellant's Brief at 40-44.

Our review is governed by the following principles:

> The prosecution may not knowingly and deliberately misrepresent the evidence in order to gain a conviction. Nevertheless, a claim of purposeful prosecutorial misrepresentation will not stand if examination of the record fails to reveal any indication of deceptive tactics on the part of the prosecution. Minor discrepancies in the Commonwealth's case will not be considered false evidence.

***Commonwealth v. Ali***, 10 A.3d 282, 294 (Pa. 2010) (citations omitted).

With respect to Respes, Appellant notes that Respes testified that he was not threatened and that he only sought relocation to enable his mother

_____

[25] As noted above, Appellant's sole reference to exculpatory evidence was that Yvette Morris indicated that Tiara Young heard rumors that Kamac shot Decedent.

to move to a better neighborhood. From this Appellant complains that all evidence that Respes was threatened was false and the Commonwealth knowingly admitted false evidence of threats. Such a boilerplate allegation false to establish "fraud" or prosecutorial misconduct. *See id.*

With respect to Detective Verrecchio's testimony that he obtained information regarding a weapon, we have previously noted that Detective Verrechio's reference was premised on a mistake. Appellant, however, asserts that the Commonwealth must have "intended to sneak this false evidence in through Dt. Verrecchio's testimony." Appellant's Brief at 44.

Appellant's assertions fail to establish any arguable merit to his argument that the Commonwealth knowingly attempted to introduce false evidence. Indeed, as discussed above, the detective testified to this matter on cross-examination by trial counsel, and there is no indication that the Commonwealth intended to admit the evidence. Thus, no relief is due.

### 9. Trial counsel's failure to object to the numerous instances of prosecutorial misconduct in closing argument

In his next issue, Appellant claims that the PCRA court erred in rejecting his argument that trial counsel failed to object to the Commonwealth's closing argument. Appellant asserts that the prosecutor expressed her personal opinions by calling a defense witness a liar, shifted the burden of proof by noting Appellant did not call additional alibi witnesses, and established Appellant's guilt when the prosecutor referred to him as a stone cold killer. Appellant's Brief at 44-47.

- 46 -

As our Supreme Court has noted,

[i]t is settled that it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses. However, the prosecutor **may comment on the credibility of witnesses**. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor.

***Commonwealth v. Chmiel***, 889 A.2d 501, 544 (Pa. 2005) (citations omitted and emphasis added).

Here, the instances that Appellant characterizes as the prosecutor expressing her personal opinion were simply her argument regarding the credibility of certain witnesses and the credibility of Appellant's alibi defense. *See* N.T. Trial, 5/28/13, at 79-81. Moreover, trial counsel had made Detectives Gaul and Verrecchio out to be liars. *See id.* at 23, 25-26, 32-33, 41, 44-45. Thus, the Commonwealth's argument concerning credibility is a logical and vigorous response.

Moreover, we agree with the PCRA court that "[t]he prosecutor's comment that [Appellant's] associates Natika Hawkins, Dooler, and Black were not at trial is a logical attack on alibi witness [Anara] Brown's credibility, not an impermissible shifting of the burden of proof." PCRA Ct. Op. at 18. As to the use of the phrase "stone cold killer," this is nothing more than oratorical flair. [CITE]. Thus, we discern no basis to disturb the PCRA court's ruling that Appellant failed to establish arguable merit to his claim that trial counsel was ineffective for failing to object during closing argument.

**10.      Trial counsel's failure to object to the prosecutor improperly focusing the jury's attention on the element of fear in order to inflame the passions of the jury**

Appellant's next issue focuses on the PCRA court's rejection of his claim that trial counsel failed to object to prosecutorial misconduct based on the Commonwealth's references to and admission of evidence of threats. Appellant's Brief at 48-51. Appellant contends the Commonwealth intentionally inflamed the passions of the jury such that it could not have rendered a fair verdict.

However, as discussed above, the threat evidence was admitted for the narrow purpose of evaluating the credibility of Cunningham and Respes and specifically weighing their prior statements to the police versus their trial testimony recanting their statements. As we have also stated above, Appellant cannot establish prejudice in light of the trial court's cautionary instructions. Moreover, we note that trial counsel did object shortly after the above-recited passage when the Commonwealth's argument began to implicate the specific facts of this case. Thus, Appellant failed to establish arguable merit to this re-casted claim of ineffectiveness.

To summarize our review of Appellant's first ten issues claiming ineffective assistance of counsel, we conclude Appellant failed to establish arguable merit in Issues 1, 3(A)-(C), 4(A) 5, 6 (A)-(D), 7, 8, 9, and 10. We further conclude that Appellant failed to establish prejudice in Issues 3(D), 4(B)-(D), and 6(E). For these reasons, we decline to disturb the PCRA court's rulings on Appellant's individual claims of ineffective assistance of counsel.

## 11.     Cumulative effect of the errors

Appellant's next issue raises a claim of cumulative error. According to Appellant,

> [c]ounsel opened the door to a wide range of hearsay evidence and prior bad acts. All of which went directly towards [A]ppellant's guilt. [T]rial counsel not only elicited prejudicial information but allowed the prosecutor to undermine[ A]ppellant's trial. The prosecutor [used] the victim hearsay statements as substantive evidence of guilt, labeled [A]ppellant's alibi defense as fraudulent, used the element of fear to inflame the jury, and [failed] to turn over pretrial discovery material, which created a trial by ambush. Also[,] the prosecutor introduce[d] false evidence into the guilt of [A]ppellant. Moreover, trial counsel had witnesses who were willing to come to court and testify to [A]ppellant's innocence and counsel failed to used exculpatory evidence within his possession.

Appellant's Brief at 51. Appellant concludes that "these errors destroyed the confidence of [A]ppellant's trial." *Id.* at 52.

The Pennsylvania Supreme Court has stated:

> We have often held that "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

*Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011) (citations omitted).

As noted above, Appellant did not establish prejudice with respect to the following individual issues: (1) Issue 2, which relates to hearsay evidence about the confrontation between Kamac and Decedent; (2) Issue 3(D), which relates to the prosecutor's question of Cunningham regarding their meeting before trial, (3) Issue 4(B), which relates to Detective Verrecchio's references

to Raheem Zachary; (4) Issue 4(C) which relates to Detective Verrecchio's information about a weapon; and (5) Issues 4(D) and 6(E), which relate to Detective Verrecchio's reference to Appellant's statement regarding "Xannies." Following our review, we conclude that the combined effect of these issues did not undermine the reliability of the jury's verdict. As noted above, Respes unequivocally identified Appellant as the shooter in his prior statement to the police and at the preliminary hearing. Although Respes recanted his identification of Appellant at trial, he continued to suggest that the shooter "looked like" Appellant. Thus, Appellant's claim of cumulative error fails.

**12.    PCRA court's error by denying Appellant's PCRA petition without an evidentiary hearing, failing to grant leave to amend, and accepting PCRA counsel's *Finley* letter & 13. PCRA counsel's ineffectiveness**

Appellant's final two issues, which we address together, allege error in the PCRA court's decisions to (A) deny relief without a hearing, (B) deny his request to file an amended petition, and (C) permit PCRA counsel to withdraw despite Appellant's allegations of PCRA counsel's ineffectiveness. Appellant's Brief at 11-12.

(A)    Evidentiary hearing

Appellant argues that the PCRA court erred in declining to hold an evidentiary hearing. He contends that he was entitled to a hearing to consider claims that the PCRA court dismissed based on findings that trial counsel acted with a reasonable strategic basis. He further contends that the credibility of

Raheem Zachary's recent statements indicating Appellant did not shoot Decedent were at issue.

It is well-settled that "[t]here is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary." **Commonwealth v. Jones**, 942 A.2d 903, 906 (Pa. Super. 2008).

However, because we have concluded above that Appellant failed to establish a genuine issue of material fact on any of his ineffectiveness claims, we discern no error in the PCRA court's decision to deny Appellant's petition without a hearing. **See id.**

### (B)    Denial of request to amend petition

Appellant argues that the PCRA court erred by failing to grant him leave to amend his PCRA petition and instead accepting PCRA counsel's petition to withdraw. However, this contention amounts to little more than a bald claim in Appellant's brief. **See** Appellant's Brief at 11 (noting that the PCRA court found his claims to be largely incomprehensible and this alone "should have given the PCRA court reason to grant leave to amend these defects").

The decision whether to permit amendment is within the PCRA court's discretion. **See Commonwealth v. Williams**, 732 A.2d 1167, 1191 (Pa. Super. 1999). Amendment shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 905(A). While Rule 905 provides for liberal

amendment, when such amendment is frivolous or meritless, such amendment is unnecessary. **See** Pa.R.Crim.P. 907(1).

Instantly, the PCRA court conducted an independent review of the record and determined that no relief was due. Thus, permitting amendment of Appellant's PCRA petition was unnecessary. While the PCRA court found portions of Appellant's brief to be incomprehensible, the court addressed each potential issue it perceived from Appellant's petition and his Rule 907 response. Additionally, Appellant has adduced no further materials or claims in this appeal worthy of further relief. Therefore, we discern no error on the part of the PCRA court in denying Appellant's request to amend his PCRA petition.

(C)   PCRA counsel's ***Turner/Finley*** letter and ineffectiveness

Finally, Appellant asserts that PCRA counsel failed to follow the standards of ***Turner/Finley*** when seeking leave to withdraw. Appellant's Brief at 55. Appellant further raises claims that PCRA counsel was ineffective for the following reasons:

1.  Failure to investigate Tiara Young;

2.  Failure to raise trial counsel ineffectiveness for failing to interview and call Raheem Zachary;

3.  Failure to raise trial counsel ineffectiveness for failing to investigate Mr. Cunningham's claim of police brutality;

4.  Improvidently filing a ***Turner/Finley*** letter and failing to follow the standard of ***Turner/Finley***; and

5. Failing to discover newly discovered evidence of a ***Brady v. Maryland***[26] violation, namely Appellant's belief that Aaron Respes received a deal in exchange for his testimony.

Appellant's Brief at 52.

In order to withdraw pursuant to ***Turner***/***Finley***,

> [i]ndependent review of the record by competent counsel is required before withdrawal is permitted. Such independent review requires proof of:
>
> 1. A "no-merit" letter by PCRA counsel detailing the nature and extent of his review;
>
> 2. The "no-merit" letter by PCRA counsel listing each issue the petitioner wished to have reviewed;
>
> 3. The PCRA counsel's "explanation", in the "no-merit" letter, of why the petitioner's issues were meritless;
>
> 4. The PCRA court conducting its own independent review of the record; and
>
> 5. The PCRA court agreeing with counsel that the petition was meritless.

***Commonwealth v. Pitts***, 981 A.2d 875, 876 n.1 (Pa. 2009) (citation and brackets omitted). Additionally,

> PCRA counsel who seeks to withdraw must contemporaneously serve a copy on the petitioner of counsel's application to withdraw as counsel, and must supply to the petitioner both a copy of the "no-merit" letter and a statement advising the petitioner that, in the event that the court grants the application of counsel to withdraw, he or she has the right to proceed *pro se* or with the assistance of privately retained counsel.

***Commonwealth v. Widgins***, 29 A.3d 816, 818 (Pa. Super. 2011) (citation and emphasis omitted).

_____

[26] ***Brady v. Maryland***, 373 U.S. 83 (1963).

Instantly, PCRA counsel complied with the procedural requirements for withdrawing from representation. Therefore, Appellant's assertion that counsel failed to follow the **Turner**/**Finley** standard to withdraw warrants no relief.

As to the PCRA counsel's alleged failure to investigate Tiara Young and Raheem Zachary as witnesses,[27] we have previously concluded that those arguments lacked merit. Thus, there can be no ineffective assistance of PCRA counsel in relation to these claims.

As to the failure to investigate Cunningham's claim of police brutality, we have already concluded that the PCRA court properly determined that further evidence regarding Detective Pitts was not relevant or admissible at trial. Thus, Appellant's claim that PCRA counsel should have conducted further research into this matter lacks arguable merit.

Finally, as to Appellant's assertion of a **Brady** violation, Appellant contends that there was a cooperation agreement between Respes and the Commonwealth. Specifically, Appellant claims that the Commonwealth withdrew attempted murder charges against Respes shortly after Appellant was sentenced.

However, Appellant was well aware of the open charges against Respes at trial. During direct examination, the Commonwealth questioned Respes

_____

[27] We note that PCRA counsel averred that he attempted to contact Tiara Young, but that she could not be found. Additionally, Appellant raised his claim regarding Zachary in response to the PCRA court's Rule 907 notice.

regarding Respes' open case for attempted murder. N.T., 5/21/13, at 153. The Commonwealth further elicited Respes' testimony that there was no deal with the police or the Commonwealth in exchange for his testimony. *Id.* at 154. To the extent Appellant now speculates that a cooperation agreement was in place, we note that Respes recanted his identification of Appellant at trial and was not a cooperative witness for the Commonwealth. Thus, Appellant's claim that the Commonwealth violated *Brady* does not warrant relief.

Order affirmed. Application to vacate and remand denied.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/18